UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

F.S. SPERRY CO., INC.,                )
                                      )
            Plaintiff,                )
                                      )
v.                                    )      No.:   3:17-CV-102-TAV-HBG
                                      )
DANIEL SCHOPMANN, et al.,             )
                                      )
            Defendants.               )

## MEMORANDUM OPINION

This civil action is before the Court on plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 10]. Plaintiff requests injunctive relief related to defendant Revolution Industrial Group's ("RIG") refractory business. The parties appeared before the Court for oral argument on July 12, 2017, at which time they presented argument and offered evidence related to the issues addressed in plaintiff's motion. For the reasons explained below, the Court will grant in part and deny in part plaintiff's motion for injunctive relief.

## I.      Background

Plaintiff is a refractory contractor, and defendants Daniel Schopmann, Ronald Meadows, and Jeremy Roach worked for plaintiff at its Knoxville office. All three of these individuals simultaneously resigned from their employment with plaintiff on February 21, 2017, and went to work for defendant RIG. RIG performs several different services, including refractory services like those plaintiff offers. Plaintiff brought this action on March 23, 2017, alleging that Schopmann, Meadows, and Roach utilized plaintiff's

proprietary information to prepare a business forecast for RIG. Plaintiff further alleges that these individuals later used the same proprietary information to solicit plaintiff's customers, employees, and vendors.

While at RIG, Schopmann worked for plaintiff as a Branch Manager, Meadows worked for plaintiff as a Sales Manager, and Roach worked for plaintiff as a Construction Manager. To obtain their positions, Schopmann and Meadows executed Non-Competition, Non-Solicitation, and Non-Disclosure Agreements (collectively, the "Agreements"). Since commencing this action, plaintiff has been unable to locate a similar agreement for Roach. These Agreements prohibit defendants from competing directly or indirectly with plaintiff and from soliciting or offering employment to plaintiff's employees [*See* Docs. 1–1, 1–2]. At RIG, Schopmann was initially the Chief Executive Officer, but he changed his title to "Executive VP of Mechanical" after plaintiff initiated this action. Meadows was RIG's Director of Operations, but subsequently changed his title to "Director of Operations– Mechanical." Roach is RIG's "Refractory Construction Manager."

RIG was registered as an LLC on January 11, 2017, which was over a month before Schopmann, Meadows, and Roach resigned from plaintiff's employment no February 21, 2017. As RIG is currently structured, it consists of two separate divisions, a Refractory Division that does work like that performed by plaintiff, and a Mechanical Division that performs Certified Mechanical Contractor ("CMC") services.

Plaintiff initially requested that the Court enjoin defendants from the following:

1.     engaging in further conduct that would constitute the same or similar violations as alleged in plaintiff's causes of action;

2.    continuing defendants' misappropriation of plaintiff's trade secret[s], confidential information, and proprietary information;

3.    using or disclosing any of plaintiff's trade secrets, confidential information, or proprietary information;

4.    contacting any of plaintiff's vendors, customers, independent contractors, or consultants regarding plaintiff's business relationship with that person or entity; and

5.    attempting to delete, modify, alter, or otherwise destroy any potentially discoverable or relevant electronic information.

[Doc. 1 p. 72].  In response, defendants have agreed to limited injunctive relief.[1]

Specifically, defendants are willing to submit to the following injunctive relief:

1.    defendants Schopmann and Meadows are willing to be enjoined for a period of two years from competing directly or indirectly with plaintiff in the State of Tennessee or any adjacent state in the fields of refractory, insulation, and corrosion-resistant masonry installation and contracting, as well as refractory, insulation, and corrosion-resistant material sales;

2.    defendants Schopmann and Meadows are willing to be enjoined for a period of two years from soliciting, offering employment to, otherwise attempting to hire or retain, or assisting in the hiring or retention of any of plaintiff's employees, independent contractors, or consultants;

3.    defendants Schopmann and Meadows are willing to be enjoined for a period of two years from encouraging, inducing, or assisting others in inducing any person or entity to terminate his, her, or its employment, contract, independent-contractor relationship or consulting relationship with plaintiff, or in any way interfering with any such relationship;

4.    defendants Schopmann and Meadows are willing to be enjoined for a period of two years from calling on, soliciting, interfering with, or

---

[1] In agreeing to limited injunctive relief, defendants do not admit any wrongdoing and do not waive any defenses [Doc. 39 p. 5].

accepting business from plaintiff's customers, with respect to refractory work only;

5.  defendants Schopmann and Meadows are willing to be enjoined for a period of two years from calling on, soliciting, or interfering with any efforts of plaintiff concerning any customer or prospective customer, with respect to refractory work only;

6.  all defendants agree to be enjoined from encouraging, inducing, or assisting others in inducing any person or entity who is a vendor or supplier of plaintiff to terminate his, her, or its contact or relationship with plaintiff, or interfering with any such relationship; and

7.  all defendants agree to be enjoined from using, exploiting, or disseminating to third-parties plaintiff's confidential, proprietary, and customer-related information.

[Doc. 39 pp. 5–6]. Thus, the primary issues left for the Court to resolve are whether defendants may still compete directly or indirectly with plaintiff in fields adjacent to refractory work, and whether RIG and Roach may still compete with plaintiff in the refractory business [Doc. 39 p. 6].[2]

## II.    Standard of Review

Under Federal Rule of Civil Procedure 65, a party may seek injunctive relief if it believes it will suffer irreparable harm or injury during the pendency of the action.  A temporary restraining order "is meant to preserve the status quo until a court can make a reasoned resolution of a dispute." *Black v. Cincinnati Fin. Corp.*, No. 1:11-cv-210, 2011

---

[2] While plaintiff initially sought to enjoin all defendants from competing in any field adjacent to the refractory business [Doc. 10], plaintiff appears to now only seek to prevent defendants from offering services performed by RIG's Refractory Division [Doc. 44 p. 29].  Thus, the Court will not consider the issue of whether defendants should be enjoined from competing in the industry in its entirety.

4

WL 1640962, at *1 (S.D. Ohio May 2, 2011) (citing *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996)).  A temporary restraining order is of short duration and may be issued without notice to the adverse party.  *Id.* (citing *Workman v. Bredesen*, 486 F.3d 896, 922 (6th Cir. 2007)); *see also* Fed. R. Civ. P. 65(b).  If a defendant is on notice, however, a request for a temporary restraining order may be treated as a motion for a preliminary injunction.  Fed. R. Civ. P. 65(a)(1).

In determining whether to grant a plaintiff's request for injunctive relief, the Court must consider four factors: (1) whether the movant would suffer irreparable harm without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the public interest would be served by the issuance of the injunction; and (4) whether the movant has demonstrated a strong likelihood of success on the merits. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).  These factors are "not prerequisites that must be met," but rather considerations the Court must balance.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

Because a preliminary injunction is "an extraordinary remedy never awarded as of right," the Court must carefully consider the scope of the plaintiff's request and award injunctive relief only upon a clear showing that plaintiff is entitled to such relief.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  The movant must "carry his or her burden of proving that the circumstances clearly demand it."  *Overstreet,* 305 F.3d at 573.

## III. Analysis

The two issues remaining before the Court are whether Roach should be enjoined from working in RIG's Refractory Division and whether RIG should be enjoined from performing refractory services. Plaintiff asserts six claims against defendants: breach of contract, inducement of breach of contract, intentional interference with business relationships, breach of the duty of loyalty, civil conspiracy, and vicarious liability. The Court will first assess the likelihood of success on the merits of each claim against Roach and RIG. In assessing the likelihood of success on the merits against defendants, the Court will focus its attention on the most relevant claims against Roach and RIG specifically. The Court will then consider whether plaintiff will suffer irreparable harm without the injunction, whether issuance of the injunction will cause substantial harm to others, and whether issuance of the injunction will serve the public interest.

### A. Likelihood of Success on the Merits

The preliminary injunction has a limited purpose, which is "to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A party "is not required to prove his case in full at a preliminary injunction hearing." *Id.* However, "a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F. 3d 393, 402 (6th Cir. 1997). The Court must determine that "the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* The plaintiff must have demonstrated a

strong "*probability* of success on the merits." *Mason Cty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977). To determine if plaintiff here has met its burden, the Court will evaluate each claim in turn.

### 1. Breach of Contract

Plaintiff first contends that defendants breached the Agreements. In Tennessee, "a viable claim for breach of contract has three essential elements: [1] the existence of an enforceable contract; [2] nonperformance amounting to a breach of that contract; and [3] damages caused by the breach of the contract." *Lewis v. MedAssets Net Revenue Sys., LLC*, No. 3:11-cv-0387, 2012 WL 3061855, at *10 (M.D. Tenn. July 26, 2012) (citing *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006)).

With respect to Schopmann and Meadows, plaintiff is likely to succeed on the merits of its breach of contract claim. The parties do not appear to dispute the validity of the Agreements or that the Agreements prevent Schopmann and Meadows from competing with plaintiff in performing refractory services.[3] However, the parties dispute whether Schopmann and Meadows violated their Agreements by helping create RIG and establish its Refractory Division. As a result of the alleged breach of contract claims, plaintiff asserts that it has suffered damages.

---

[3] Defendants argue that the Agreements are unenforceable to the extent they seek to enjoin Schopmann and Meadows from working in the Mechanical Division [Doc. 12 pp. 11–14]. Because plaintiff is seeking to enjoin Schopmann and Meadows from performing refractory services, the Court does not need to reach the issue of whether the Agreements are enforceable to enforce the two from working in the Mechanical Division.

In support of its position, plaintiff offered evidence that both Schopmann and Meadows played a pivotal role in planning RIG. Plaintiff introduced emails indicating Schopmann helped prepare a business forecast for RIG and design the company logo [Doc. 44–20], and Meadows assisted in hiring employees for the refractory department, including former plaintiff employees [Doc. 44-15]. Furthermore, there is evidence that both Schopmann and Meadows corresponded with certain of plaintiff's clients, helped establish RIG's accounts, and may have even participated in preparing a bid for a refractory project [*See, e.g.*, Docs. 44-4, 44-7, 44-12].

Defendants assert that Schopmann and Meadows did not play a role in RIG's refractory department, and they did not participate in the hiring process for RIG's new employees [Doc. 69 p. 17]. At the preliminary injunction hearing, Meadows testified that he has not spoken with any of plaintiff's employees since leaving [*Id.*]. While he did the administrative paperwork, he did not attempt to get them to work at RIG [*Id.*]. Schopmann was copied on emails regarding the hiring of employees, but he was not directly involved in the hiring them [*Id.*].

Beyond the allegations that Schopmann and Meadows were both soliciting former employees and helping form RIG, plaintiff also claims that they stole confidential and proprietary information on a USB flashdrive ("thumb drive"). Plaintiff asserts that Schopmann accessed confidential information that he would have no legitimate reason to access "the day before he quit" [Doc. 64 pp. 112–13]. Plaintiff alleges that Schopmann used the thumb drive to take plaintiff's files and then tried to cover his tracks by deleting

the files and overwriting the metadata of the files [Doc. 68 p. 3]. In support of this claim, plaintiff submits the declaration of expert Jim Kempvanee, who discusses the thumb drive activity as it related to both Schopmann's work computer and his personal laptop—most notably on February 20, 2017, the day before Schopmann left plaintiff's employment [Doc. 68–1 p. 5]. Attached to the expert's declaration is a log of the recovered file names, which includes plaintiff's business files that existed on the thumb drive after that date [Doc. 68–1 pp. 56–100]. Plaintiff submits that this stolen material on the thumb drive has allowed RIG to underbid plaintiff, causing plaintiff to lose customers [Doc. 10–1 p. 15].

Defendants dispute plaintiff's characterization of the thumb drive evidence. Defendants first state that plaintiff did not have a policy that forbid the use of a thumb drive [Doc. 69 p. 18]. Because Schopmann's office space was condemned, plaintiff's employees had to use thumb drives to access documents on their work computers [*Id.*]. Defendants assert that plaintiff has failed to show that Schopmann took proprietary information [*Id.* at 19–20]. Furthermore, they argue that the information plaintiff claims Schopmann took could have been acquired from the vendors directly [*Id.*].

Because the parties do not dispute whether the Agreements for Schopmann and Meadows as they relate to the Refractory Division are valid, the Court need only determine whether plaintiff has raised questions "so serious, substantial, difficult and doubtful" as to whether Schopmann and Meadows violated the Agreements. *Six Clinics Holding Corp.*, 119 F. 3d at 402. The Court finds that plaintiff has met this burden. While defendant does rebut some of plaintiff's evidence, plaintiff has supported its claim with testimony,

declarations, and evidence of breach of contract by both Schopmann and Meadows. Since this question is a "fair ground for litigation and . . . more deliberate investigation," plaintiff has shown a likelihood of success on the merits. *Id.*

With respect to Roach, plaintiff is not likely to succeed on its breach of contract claim. Plaintiff has been unable to produce Roach's agreement, and testimony at the preliminary injunction hearing indicated that no such agreement had ever been signed [*See e.g.*, Doc. 64 pp. 85–88, pp. 162–64, pp. 277–78]. Based on the record evidence, plaintiff is also unlikely to prove the existence of an oral or implied-in-fact agreement. Because no enforceable contract was signed, plaintiff is unlikely to succeed on a breach of contract claim against Roach. *See Lewis*, 2012 WL 3061855, at *10.

Plaintiff also alleges that defendants have acted in concert to directly or indirectly breach the Agreements, and that under joint-enterprise liability, Roach and RIG can be held liable for breaching the Agreements of Schopmann and Meadows [Doc. 68 p. 17]. Plaintiff agrees that Roach was not party to the Agreements of Schopmann and Meadows; however, plaintiff claims that because Roach assisted them in breaching their Agreements, Roach is "vicariously liable under the theory of Joint Enterprise liability" [*Id.*]. For support, plaintiff cites to *Fain v. O'Connell*, which analogizes the doctrine of vicarious liability in a joint enterprise with the law of partnership. 909 S.W.2d 790, 792 (Tenn. 1995). As defendants point out, though, *Fain* was a negligence action for personal injuries [Doc. 69 p. 24]. Other Tennessee courts have stated that this theory can be useful to "impute the negligence of one of the parties to the other." *Stewart v. Deutsche Bank Nat'l Tr. Co.*, No. 3:08-cv-475,

2010 WL 4004670, at *11 (E.D. Tenn. Oct. 12, 2010) (quoting *Schwartz v. Johnson*, 280 S.W. 32, 33 (Tenn. 1926)).  Defendants state that plaintiff "fails to cite a single case where the joint enterprise theory of liability was applied to a breach of contract action" [Doc. 69 p. 24 (internal quotation marks omitted)].  The Court has likewise been unable to locate any Tennessee authority that supports plaintiff's joint enterprise theory.  Plaintiff has failed to meet its burden of showing how it could succeed under a theory of joint enterprise liability.

### 2.  Inducement of Breach of Contract

Plaintiff next submits that Roach and RIG induced or procured a breach of Schopmann's and Meadows's Agreements [Doc. 10 p. 16].  To prevail on a common law theory of inducement of breach of contract, the plaintiff must show (1) the existence of a legal contract between the plaintiff and a third party, (2) the defendant's awareness of the contract, (3) the defendant's malicious intent to induce breach of the contract, (4) that the defendant's actions proximately caused the breach of contract, and (5) resulting damages to the plaintiff.  *See Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629, 637 (M.D. Tenn. 2006).  In this context, malice "does not require ill will or spite towards the injured party," but rather only "the intentional commission of a harmful act without justifiable cause." *Id.* at 639.  Tennessee has established a statutory cause of action for procurement of breach of contract that incorporates with these common law elements. *See* Tenn. Code Ann. § 47-50-109.

In support of this claim, plaintiff submits that Roach and RIG were aware of the agreements with plaintiff because plaintiff sent Roach, Schopmann, and Meadows cease-and-desist letters on February 24, 2017 [Doc. 10 p. 17]. Plaintiff also submitted evidence of email communications on October 25 and 26, 2016, between Schopmann and Knorr discussing Schopmann's non-compete agreement [Doc. 44–17, 18]. Plaintiff asserts that this evidence shows that Roach and RIG knew of the existence of the Agreements between plaintiff and Schopmann and Meadows. Defendants do not argue that Roach and RIG were unaware of the Agreements. Instead, they focus on disputing whether Roach and RIG acted with malicious intent to induce Schopmann and Meadows to breach their contracts.

Plaintiff asserts that Roach and RIG maliciously intended to induce a breach of the Agreements. Plaintiff highlights various recruitment tactics employed by RIG, including a meeting between Roach and another RIG agent and plaintiff's interim Branch Manager [Doc. 10 p. 18]. According to testimony given at the hearing, Roach contacted plaintiff's employees to recruit them for positions with RIG [*See, e.g.*, Doc. 64 pp. 246, 249]. Plaintiff also submits that Roach and RIG interfered with Schopmann and Meadows's Agreements by continuing to use plaintiff's vendors that Schopmann and Meadows allegedly set up for RIG [Doc. 68 p. 21; *see also id.* at 20 ("RIG and Roach continue to solicit and service RIG customers procured by Schopmann and Meadows in violation of their Agreements and continue to benefit from Schopmann and Meadows['] violations of their Agreements and violations of the law.") According to plaintiff, using plaintiff's vendors and soliciting plaintiff's employees led to financial gain for RIG to the detriment of plaintiff.

In response, defendants claim that because Schopmann and Meadows did not breach their Agreements, plaintiff does not have a claim for inducement of breach of contract [Doc. 12–17]. In the alternative, defendants assert that the restrictive covenants cannot be breached by actions taken by RIG and Roach. They claim that Schopmann's and Meadows's Agreements do not restrict RIG or Roach. Defendants also assert that plaintiff has failed to show that RIG or Roach acted with malice in causing any breach of the Agreements [*Id.*].

The first issue the Court must address is whether plaintiff will likely succeed on the malicious-intent element of an inducement claim. Malice merely "requires the intentional commission of a harmful act without justifiable cause." *Freeman Mgmt. Corp.,* 461 F. Supp. 2d at 639. Plaintiff has provided evidence that Knorr, who is the CEO of RIG, and Roach were both aware of the Agreements and yet still used Schopmann and Meadows to further RIG's Refractory Division. These two individuals were hired, in part, for their experience in such a business, which evident from the fact that Schopmann and Meadows helped set up the vendors RIG and Roach continue to use to this day. The question is thus whether RIG and Roach acted intentionally to use these vendors knowing it would cause harm to plaintiff.

While Schopmann and Meadows both assert that they are no longer involved in the refractory side of RIG's business, there is evidence that they have previously violated their Agreements. *See infra* Section III.A.1. Because Knorr, acting on behalf of RIG, hired Schopmann and Meadows to help set up vendor accounts, in violation of their Agreements,

knowing that it would cause a loss to plaintiff's refractory business, plaintiff has shown that Knorr intended to induce a breach of the Agreements. Plaintiff has failed to show, however, that Roach maliciously intended to induce a breach of the Agreements. It is unclear to what extent Roach had control over Schopmann and Meadows, and so to the extent that Roach benefitted from Schopmann's and Meadows's violations, he did not induce them to breach their Agreements.

Plaintiff has provided evidence that raises substantial questions as to whether defendant RIG induced Schopmann and Meadows to breach their respective Agreements, and thus it is likely that plaintiff can succeed on the merits of its inducement claim against RIG. However, plaintiff has not provided sufficient evidence showing that Roach's activity proximately caused Schopmann and Meadows to breach their Agreements.

### 3. Intentional Interference with Business Relationships

Plaintiff also asserts a claim against all defendants for intentional interference with business relationships. In order to succeed on a claim of tortious interference with business relationships, the plaintiff must establish: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *See Trau-Med of Am. v.*

*Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).  Notably, actions that constitute a breach of a fiduciary relationship constitute improper means.  *See id.* at 701 n.5.

Plaintiff asserts that it had existing business relationships with third parties—specifically, all of its customers.  For example, plaintiff focuses on its previous relationship with its customer, Aisin/Clinton [*See e.g.*, Doc. 10–1 pp. 20–21].  Defendants knew about this relationship and, in fact, had personal relationships with this customer through their employment with plaintiff.  Schopmann had a good relationship with Tony White of Aisin/Clinton and Roach had a good relationship with James Thacker of Aisin/Clinton.  Defendants do not appear to dispute the fact that plaintiff had a relationship with Aisin prior to the formation of RIG, nor do they dispute that Schopmann and Roach had developed relationships with Aisin and other clients during their employment.

Plaintiff next asserts that defendants intended to cause a breach or termination of the business relationships.  Plaintiff claims that defendants tried to delay jobs originally committed to plaintiff so they could secure the same jobs after forming RIG [Doc. 10–1 p. 20].  Additionally, plaintiff states that defendants misappropriated confidential information for the purpose of underbidding plaintiff and securing plaintiff's customers [*Id*; Doc. 68].  This allegedly included materials related to Aisin, SDR, Energy Solutions, and Stellar Materials [Doc. 68].  Plaintiff maintains that the confidential material used by Schopmann, Meadows, and Roach was obtained in order to underbid plaintiff, knowing that underbidding would disrupt plaintiff's existing relationships.  According to plaintiff,

defendants' actions went beyond mere competition and instead cheated plaintiff out of an opportunity to renew its accounts with existing customers.

Defendants assert that they did not misappropriate information and that plaintiff's arguments are not supported by the evidence. Defendants state that of the customers mentioned by plaintiff, several chose not to award jobs to either defendant RIG or plaintiff. Defendants argue that this shows that customers simply took their business elsewhere, and this decision cannot be attributed to defendants. Furthermore, defendants claim that in at least one instance, RIG's bid was actually higher than plaintiff's bid, so defendants did not actually undercut plaintiff's bid [Doc. 69 p. 11].

Once plaintiff establishes intent, plaintiff must show that defendants had an improper motive in interfering with plaintiff's business relationships or that they used improper means to interfere with business relationships. Improper motive exists when the primary purpose for defendants' actions is to injure the plaintiff. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Improper means are those "that are illegal, independently tortious, or that violate an established standard of a trade or profession." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W. 3d 169, 177 (Tenn. Ct. App. 2007). Entering a competitive market and competing with existing players is not enough to constitute improper means. Restatement (Second) of Torts § 768 cmt. b (Am. Law Inst. 1979).

Plaintiff asserts that defendants misappropriated confidential information about previous bids and customer accounts, which is an improper means of competing with

plaintiff. In support of this, plaintiff relies on the thumb drive evidence that was produced at the hearing. Plaintiff claims that defendants moved files to and from plaintiff's work computers to a personal thumb drive. These files were later uploaded to Schopmann's computer, and then the entire thumb drive was overwritten with old pictures and videos [Doc. 68 p. 3]. Plaintiff also notes that defendants used defamatory statements about plaintiff's experience, capacity, and resources [Doc. 10–1 p. 20].

Plaintiff cites *FTA Enterprises, Inc. v. Pomeroy Computer Resources, Inc.*, where an employee knowledgeable about a specific account disclosed confidential information regarding that account, which allowed the competition to use that information to solicit customers. E200001246COAR3CV, 2001 WL 185210, at * 4 (Tenn. Ct. App. Feb. 12, 2001). Another employee leveraged confidential information, manipulated the internal paging and email system, and hired the best employees from rival companies "just to get rid of them." *Id.* at *4. In both instances, the court found that the employees had intentionally interfered with business relationships. *Id*. Similarly, plaintiff claims that Schopmann, Meadows, and Roach were knowledgeable about certain accounts and used confidential information to win bidding projects. Plaintiff also claims that the defendants tried to hire plaintiff's employees after defendants had left plaintiff's employment [*See, e.g.*, Doc. 10–7, Doc. 64 p. 246].

As discussed previously, defendants argue that plaintiff did not have a policy that forbid the use of a thumb drive [Doc. 69 p. 18]. In fact, defendants assert that plaintiff's employees had to use thumb drives to access documents on their work computers after the

building was condemned [*Id.*]. Because they were using the thumb drives for legitimate business purposes, defendants argue, they did not interfere with business relationships.

Despite defendants' disagreement with plaintiff's portrayal of the evidence, plaintiff has raised "serious" and "difficult" questions so "as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp.*, 119 F. 3d at 402. Plaintiff has provided evidence showing that defendants may have taken confidential information to use against plaintiff. Plaintiff has also demonstrated how this type of activity is particularly damaging in an industry that relies on competitive bidding to secure business. Thus, plaintiff is likely to succeed on its claim of defendants' intentional interference with business relationships.

### 4.     Breach of Duty of Loyalty

Plaintiff's breach of duty of loyalty claim is closely related to its claim for interference with business relationships. Plaintiff asserts that defendants breached their fiduciary duties to plaintiff and, as a result, interfered with plaintiff's business relationships [Doc. 44 pp. 18–19]. In support of this claim, plaintiff points to where the Tennessee Court of Appeals held that "the duty of loyalty imposes upon an employee an obligation to act solely for the benefit of the employer in matters within the scope of his employment" during the course of his employment. *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, 3:06-cv-456, 2006 WL 1638537, at *10 (M.D. Tenn. June 6, 2007). The court further noted that "an employee should not compete with [the] employer while still employed, regardless of whether an actual noncompetition agreement exists." *Id; see also See Knott's Wholesale*

*Foods, Inc. v. Azbell*, 01A-01-9510-CH-00459, 1996 WL 697943, at *4 (Tenn. Ct. App. Dec. 6, 1996) (holding that and employee's "conversations with customers went beyond merely notifying Knott's customers of his intentions or posing 'brief, non-specific, strictly hypothetical' queries."). Competing with an employer encompasses, for example, "an employee who solicits…coworkers to leave their jobs to work for a competitor while the soliciting employee is still being paid by the employer." *Ram Tool & Supply Co. v. HD Supply Constr. Supply Ltd.*, M2013-02264-COA-R3-CV, 2016 WL 4008718, at *5 (M.D. Tenn. July 21, 2016).

In response, defendants argue that the actions taken by defendants while still employed with plaintiff did not constitute a breach of loyalty [Doc. 69 pp. 30–31]. In support of this, defendants note that an employee who files a corporate charter for a new competing company or who informs clients of an intent to leave does not violate the duty of loyalty. *See id.* Defendants further assert that an "employee does not breach a duty of loyalty to his employer by making preparations to compete while still employed." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 964 (M.D. Tenn. 2011). Defendants claim that simply because defendants discussed their plans to resign and then resigned does not prove that they violated their duty of loyalty [Doc. 69 p. 32].

Here, the Court must decide whether defendants, during the course of their employment, merely prepared to compete with plaintiff or whether they actually began competing with plaintiff. Plaintiff outlines a timeline of RIG's formation [Doc. 44 pp. 13–18] where plaintiff shows that defendants entertained a prospective financial backer using

plaintiff's golf club membership, reviewed defendants' employment contracts, recruited plaintiff's customers to join defendants' new venture, developed a company logo, compiled business figures and records, applied for insurance using plaintiff's customer information, and acquired phones and laptops for RIG [*Id.*]. Some of this activity would likely constitute mere preparation. For example, developing a company logo, discussing financials, and acquiring equipment are necessary activities for preparing a new business. However, entertaining a prospective financial backer using plaintiff's golf club membership, using plaintiff's customer data to apply for insurance, and using plaintiff's sales figures to help develop an internal cost structure go beyond mere preparation. *See* Restatement (Second) of Agency § 393, cmt. E (Am. Law Inst. 2017) ("Even before the termination of the agency, [an employee] is entitled to make arrangements to compete, except that [the employee] cannot properly use confidential information peculiar to his employer's business and acquired therein."). Furthermore, according to plaintiff, much of the preparation—even the activity that did not directly violate the duty of loyalty—occurred during business hours while defendants were being paid by plaintiff to conduct business for plaintiff. Based on plaintiff's timeline of activity, plaintiff has shown that a "more deliberate investigation" is needed to resolve the serious question of whether defendants violated their duty of loyalty. *See Six Clinics Holding Corp.*, 119 F. 3d at 402. Plaintiff has therefore met its burden for the duty of loyalty claim at this stage of the litigation.

### 5.	Civil Conspiracy

Plaintiff's next claim is that defendants entered into a civil conspiracy. The elements of a cause of action for civil conspiracy are (1) a common design between two or more persons (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury to the plaintiff. *See Lapinsky v. Cook*, E2015-735-COA-R3-CV, 2016 WL 5385849, at *14 (Tenn. Ct. App. Sept. 26, 2016).

Plaintiff asserts that Schopmann, Meadows, Roach, and RIG all had a common purpose to take business from plaintiff to benefit themselves and RIG [Doc. 10–1 p. 22]. In the complaint, plaintiff asserts that defendants "have a common design and purposes of (1) unlawfully interfering with F.S. Sperry's business relations; (2) unlawfully competing with F.S. Sperry in violation of Schopmann and Meadows' [Agreements]; and (3) attempting to conceal their activities" [Doc. 1 p. 66]. Plaintiff again asserts that defendants used improper means by taking confidential and proprietary information. Defendants respond that plaintiff has failed to state its civil conspiracy claim with specificity, as required by Tennessee courts [Doc. 12 p. 21]. Defendants assert that plaintiff's claims are "unsubstantiated and conclusory" [*Id.*].

The Court agrees that plaintiff has not substantiated its civil conspiracy claim. Throughout its briefings, plaintiff alleges unlawful interference, unlawful competition in violation of the Agreements, and concealment of unlawful behavior; however, plaintiff does not show how this action was concerted or part of a common design. In *Marshall v.*

*ITT*, the plaintiff asserted that defendants were acting together in a conspiracy and alleged that they engaged in deceptive acts. No. 3:11-cv-552, 2012 WL 1205581, at *4 (E.D. Tenn. Apr. 11, 2012). This Court held that this was insufficient to state a claim under Tennessee law because the "complaint [wa]s devoid of any factual allegation specific to any defendant, devoid of any factual allegation describing or supporting the element of a concerted action or common design, and devoid of any factual allegation describing or supporting an overt act in furtherance of the civil conspiracy." *Id.* Similarly, plaintiff here has stated that defendants engaged in a concerted action to engage in unlawful behavior. Plaintiff alleges several claims against defendants in detail, but plaintiff fails to show that the activity was concerted or was part of a common scheme. Accordingly, the plaintiff has failed to raise substantial questions as to the validity of a civil conspiracy claim.

### 6. Vicarious Liability

Plaintiff's final claim is that RIG is vicariously liable for the acts of Schopmann, Meadows, and Roach. Plaintiff asserts that "Schopmann, Meadows, and Roach were all acting for the benefit of and as agents of RIG" [Doc. 10–1 p. 23]. Plaintiff claims that because RIG knew about the conduct of Roach, Schopmann, and Meadows, RIG is liable for their violations [*Id.*].

Defendants claim that plaintiff has failed to identify the underlying tort for RIG's alleged vicarious liability for the actions of the individuals [Doc. 12 pp. 21–22]. Defendants assert that the issue is whether an employer can be liable for employees who breach their restrictive covenants with a third party [*Id.* at 22]. Courts that have addressed

this issue have determined that liability cannot be imposed on an employer in these situations. *See, e.g.*, *MEDX, Inc. v. Ranger*, No. 91-3099, 1993 WL 21250, at *5 (E.D. La. Jan. 25, 1993); *Hagen v. Burmeister & Assocs.*, C8-98-864, 199 WL 31130, at *2 (Minn. Ct. App. Jan. 26, 1999), *rev'd on other grounds*, 633 N.W. 3d 497, 503 (Minn. 2001).

Plaintiff argues that Schopmann, Meadows, and Roach were all acting for the benefit of and as agents of RIG when attempting to further RIG's business at the expense of plaintiff and in violation of the Agreements. Plaintiff has not, however, provided the Court with any Tennessee authority indicating that an employer can be held vicariously liable when its agent violates a non-compete agreement. Accordingly, plaintiff has failed to raise substantial questions as to the validity of a vicarious liability claim. The Court, however, notes that while plaintiff has failed to show that RIG can be vicariously liable for violations made by Schopmman, Meadows, and Roach, this does not mean that RIG did not induce or procure those violations. Plaintiff's claim for inducement and procurement is a separate and independent cause of action. *See infra* Section 3.A.2.

### 7. Summary of Likelihood of Success on the Merits

Ultimately, plaintiff has shown that it is likely to succeed on the merits for several claims. Plaintiff is likely to succeed on the merits of its breach of contract claim against both Schopmann and Meadows. Plaintiff is also likely to succeed on the merits its inducement of breach of contract claim against RIG and a breach of loyalty claim against Schopmann, Meadows, and Roach. Finally, plaintiff is likely to succeed on the merits of the intentional interference with business relationships claim against all defendants.

However, plaintiff is not likely to succeed on its breach of contract claim and inducement of breach of contract claim against Roach. Additionally, plaintiff has not met its burden to show that it is likely to succeed on its civil conspiracy and vicarious liability claims.

### B. Irreparable Harm

A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. *See Certified Restoration,* 511 F.3d at 550. The Sixth Circuit has indicated that the harms alleged by plaintiff in this case—specifically, the loss of customer goodwill and the loss of fair competition resulting from a breach of a non-competition covenant—can constitute irreparable harm so as to warrant injunctive relief. *See id; see also Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir. 1992). Since plaintiff initiated this civil matter, defendants have agreed to certain injunctive relief. Schopmann and Meadows have both changed their titles, and they no longer perform refractory work at RIG. The critical question, then, is whether plaintiff is exposed to continuing irreparable harm if the Court does not enjoin RIG and Roach from performing refractory services. The Court has already found that plaintiff is likely to succeed on the merits of its inducement of breach of contract claim against RIG, its breach of loyalty claim against Roach, and its intentional interference with business relationships claim against both RIG and Roach.

Plaintiff asserts that defendants have irreparably damaged plaintiff's goodwill with its customers, and that relationships will continue to be harmed if the Court does not enjoin defendants [Doc. 44 p. 22]. For example, plaintiff has historically won the bid for the SDR

project, but after Schopmann left, RIG began contacting SDR. While neither RIG nor plaintiff won the contract, one of plaintiff's employees testified that plaintiff's relationship with SDR had become strained [Doc. 68 p. 27]. Plaintiff claims that "[t]here is also no indication that these relationships will be repaired absent the requested injunctive relief" [*Id.* at 23]. Besides the damage to goodwill, plaintiff asserts that defendants have created confusion as to their affiliation [Doc. 68 p. 27]. Furthermore, plaintiff asserts, defendants took confidential information about plaintiff's pricing structure, which will continue to harm plaintiff in the future. According to plaintiff, there is "no way . . . to measure the damage done by the unfair pricing situation that Defendants have caused" [*Id.* at 22, 26 (stating that plaintiff's president "cannot quantify his damages and has no way of knowing the full impact of what RIG has done")]. So long as defendants are able to take business away from plaintiff, plaintiff asserts that it will continue to suffer a loss of both business and employees who seek employment elsewhere as a result of decreased work [*Id.* at 26].

In response, defendants assert that plaintiff's allegations are fully compensable by monetary damages [Doc. 69 p. 43]. Defendants point to plaintiff's initial disclosures where plaintiff estimates $1,000,000 in business losses per year. Additionally, defendants dispute the harm alleged by plaintiff, stating that plaintiff has not shown that defendants took confidential information and used it to harm plaintiff [*Id.* at 34]. Thus, there is no causal connection between the alleged actions and the irreparable harm [Doc. 12 p. 23].

The Court must determine whether plaintiff's alleged harms can be fully compensated by monetary damages. *See Certified Restoration Dry Cleaning Network,*

*LLC*, 511 F.3d at 550. In making this determination, the Sixth Circuit has considered such evidence as whether the defendants had access to confidential customer information, whether they removed this information upon leaving their employment, whether they began contacting customers after arriving at their new employer, and whether they had access to the plaintiff's pricing information to underbid their former employer. *See Basicomputer Corp.*, 973 F.2d at 512.

In this case, plaintiff has shown that monetary damages cannot fully compensate its alleged injuries. Plaintiff has met its burden of showing its loss in consumer goodwill and its loss of business opportunities, both of which constitute irreparable harm. *Malibu Boats, LLC v. Nautique Boat Co.*, 997 F. Supp. 2d 866, 885 (E.D. Tenn. 2014). Here, defendants had access to plaintiff's confidential customer information [Doc. 44 p. 21]. They had access to plaintiff's pricing information, its customer lists, and its internal cost structure [*Id.*]. In a competitive bidding industry, use of another company's proprietary information can be devastating to a company, and monetary damages do not adequately compensate businesses for this harm. In addition, plaintiff provides evidence that defendants removed confidential customer information upon leaving their employment [Doc. 68 pp. 6–11]. After leaving, defendants began contacting customers and underbidding plaintiff on the accounts [Doc. 10-1 p. 24; Doc. 44 p. 21; Doc. 68 pp. 26–27]. While plaintiff can estimate some of its losses, not all the loss resulting from this conduct can be compensated through monetary damages. Strained relationships [Doc. 68 p. 27], lost confidential information

[Doc. 44 p. 21], and lost accounts [*Id.* at 21–22] are all examples of the precise type of injury that preliminary injunctions are meant to remedy.

### C.     Substantial Harm to Others

The next issue the Court must address is whether others will be substantially harmed by the issuance of a preliminary injunction.  Plaintiff states that the injunction will not harm defendants or others.  Plaintiff points to defendants' testimony at trial where Knorr admitted that the refractory side of the business was a mere "afterthought" and that the focus of RIG was on the mechanical side [Doc. 44 p. 28].  In response, defendants claim that an injunctive remedy that would prohibit RIG from competing in the refractory contracting business would "impede and stifle competition" [Doc. 12 p. 24].

The Court agrees that prohibiting a business from entering into a particular industry could harm both defendants and others in the industry.  However, this fear is relevant only to plaintiff's request for the Court to enjoin RIG from competing in the refractory contracting business.  Nothing in the parties' briefs or the other evidence in the record suggests to the Court that third parties will be harmed by other injunctive relief.

### D.     Public Interest Served

Plaintiff asserts that granting an injunction would not raise any public policy concerns [Doc. 10–1 p. 24].  Defendants, again, raise the point that competition might be stifled, thus violating public policy.  While defendants are correct to raise this issue, the Court does not find that an injunction in this case would cause any public policy concerns.  Instead, the Court finds that promoting fair competition and enforcing contractual

27

obligations are public interests that would be furthered by injunctive relief. *See, e.g.,* *FirstEnergy Sols. Corp. v. Flerick*, 5:12-cv-2948, 2012 WL 6649201, at *6 (N.D. Ohio Dec. 20, 2012).

## IV.    Conclusion

Defendants have agreed to certain injunctive relief, which the Court will adopt in an order filed contemporaneously herewith. The remaining questions before the Court are whether Roach should be enjoined from working in RIG's Refractory Division and whether RIG should be enjoined from performing refractory services. Plaintiff has demonstrated a likelihood of success on its inducement of breach of contract claim against RIG, its breach of loyalty claim against Roach, and its intentional interference with business relationships against both RIG and Roach. While the Court will not enjoin RIG from performing refractory services, nor will it enjoin Roach from working in the Refractory Division, the Court will issue a preliminary injunction to address the ongoing harms alleged by plaintiff. The Court first adopts the relief previously agreed to by defendants [Doc. 39]. In addition, because plaintiff is likely to succeed on the intentional interference with business relationships and breach of loyalty claims against Roach, the Court enjoins Roach from soliciting plaintiff's employees and interfering with plaintiff's contractual relationships. *See supra* Sections III.A.3–4.

Ultimately, plaintiff has demonstrated that it is likely to succeed on the merits of several claims. Additionally the plaintiff has demonstrated that it will suffer irreparable harm without the injunction. Furthermore, granting an injunction would not cause

substantial harm to others but would rather serve public interest.  Accordingly, plaintiff's

Motion for Preliminary Injunction [Doc. 10] will be **GRANTED IN PART and DENIED**

**IN PART**.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE